UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

PROGRESSIVE DIRECT INSURANCE
COMPANY,

Plaintiff,

v.

WILLIAM RITHMILLER and JAKE
THOMPSON,

Defendants.

Case No. 19-CV-2470 (PJS/HB)

ORDER

---

Beth A. Jenson Prouty and Stephen M. Warner, ARTHUR, CHAPMAN,
KETTERING, SMETAK & PIKALA P.A., for plaintiff.

Douglas E. Schmidt, SCHMIDT LAW FIRM, for defendant William
Rithmiller.

In 2018, defendant William Rithmiller was injured when his vehicle collided with

a vehicle driven by defendant Jake Thompson.  Jake (who was 17 years old at the time)

was insured under an automobile policy that American Family Mutual Insurance

Group ("American Family") had issued to his mother, Andrea Beaudet.

Rithmiller settled his claim against American Family pursuant to a Drake-Ryan

agreement.[1]  Rithmiller then pursued a claim against plaintiff Progressive Direct

---

[1]"A Drake–Ryan settlement is named after the Minnesota Supreme Court's
decision in *Drake v. Ryan*, 514 N.W.2d 785 (Minn. 1994).  Generally, this type of
settlement permits an insurer closest to the risk, i.e., a primary carrier, to settle with a
plaintiff in exchange for a complete release of any claims against an insured defendant,
but also preserves the plaintiff's right to pursue a claim against a secondary, or excess,

(continued...)

Insurance Company ("Progressive"), which had issued an automobile policy to Jake's step-mother, Julie Linnell-Thompson.  Jake's father, Scott Thompson, had married Julie a couple of years before the accident.

Progressive filed this action against Rithmiller and Jake, seeking a declaration that it has no duty to indemnify Jake in connection with the 2018 accident.  Progressive and Rithmiller have both moved for summary judgment.[2]  For the reasons that follow, Progressive's motion is granted, and Rithmiller's motion is denied.

I.  BACKGROUND

A.  *The Accident and the Policy*

Rithmiller was injured on February 22, 2018, when his vehicle collided with a Ford Taurus driven by Jake.  Schmidt Aff. Ex. A, ECF No. 31-1.  Jake's car was covered under his mother's automobile policy with American Family, and Rithmiller and American Family reached a Drake-Ryan settlement covering the first $100,000 of liability.  Schmidt Aff. Ex. B, ECF No. 31-1.  The settlement was insufficient to compensate Rithmiller for all of his damages, however, so Rithmiller sought additional recovery under the automobile policy that Progressive had issued to Julie (the "policy").

---

[1](...continued)
carrier up to the limits of the excess carrier's policy."  *Am. Fam. Mut. Ins. Co. v. Donaldson*, 820 F.3d 374, 376 n.2 (8th Cir. 2016).

[2]Jake failed to answer or otherwise respond to the complaint.  The Clerk entered Jake's default on April 3, 2020.  ECF No. 19.

*See* Am. Compl. ¶ 14, ECF No. 9; Def.'s Mem. Summ. J. 3, ECF No. 30; Schmidt Aff.

Ex. C, ECF No. 31-1.

The policy lists Julie as the "named insured" and identifies two "drivers and

resident relatives":  Scott and Julie's son Nicholas.  Jake is not mentioned.  The policy

also identifies three vehicles that it covers:  a Chevrolet Tahoe, a Pontiac Bonneville, and

a Chevrolet Monte Carlo.  Jake's Taurus is not mentioned.  Schmidt Aff. Ex. C, at 11–12.[3]

Part I of the policy provides that Progressive "will pay damages for bodily injury

and property damage for which an insured person becomes legally responsible because

of an accident."  *Id.* at 19.[4]  The policy defines "insured person" to include "you, a

relative, or a rated resident . . . ."  *Id.*  "You" is defined as the named insured and her

spouse—here, Julie and Scott.  *Id.*  And, as is relevant here, "relative" is defined as "a

person residing in the same household as you, and related to you by blood, marriage or

adoption . . . ."  *Id.* at 18.

---

[3]Citations to the policy will refer to the ECF page numbers that appear on the copy of the policy docketed as ECF No. 31-1.

[4]The policy uses boldface to designate words that are defined elsewhere in the policy.  The Court omits the boldface to enhance readability.

Part I of the policy also includes various exclusions from coverage, including Exclusion 11, which exempts "bodily injury or property damage arising out of the ownership, maintenance or use of any vehicle owned by a relative or a rated resident or furnished or available for the regular use of a relative or a rated resident, other than a covered auto for which this coverage has been purchased."  *Id.* at 22.  Exclusion 11 also states that it "does not apply to your maintenance or use of such vehicle[.]"  *Id.*

The parties agree that Jake is related to "you"—that is, to Julie and Scott—by "blood" (in Scott's case) and "marriage" (in Julie's). They dispute, however, whether Jake "resid[ed] in the same household" as Julie and Scott. The policy does not define the phrase "residing in the same household."

B. *Jake's Relationship with Julie and Scott*

Jake's biological parents (Andrea and Scott) never married. Prouty Aff. Ex. D, Thompson Dep. 4:6–8, ECF No. 26-1. When Jake was young, a court awarded 50-50 joint custody to Andrea and Scott. *Id.* at 5:13–17. For years, Andrea and Scott strictly followed the custody order, and Jake split his time equally between his parents' houses. *Id.* at 17:2–5. As Jake grew older, however, he wanted to spend more time at his mother's house, as her house was closer to his school and job. *Id.* at 6:3–10. Scott agreed that it made sense for Jake to spend more time at Andrea's house. *Id.* at 5:18–6:6. By 2016, Jake was living full-time with Andrea. *Id.* at 14:12–21, 36:16–22. Andrea and Scott never returned to court to formally modify the custody order.

Despite this change in Jake's living arrangements, Jake and Scott maintained a close relationship. *Id*. at 7:15–20. Scott regularly visited Jake at work, they communicated daily, and they enjoyed hunting and skiing together. *Id.* at 9:3–10, 22:25, 27:3–4. Scott remained involved in Jake's schooling and attended parent-teacher conferences. *Id*. at 28:14–19. Scott also continued to pay child support, provided health

-4-

insurance for Jake, and helped Andrea pay for the American Family policy that covered Jake's car. *Id*. at 12:1–2, 12:21–24, 22:8–10.

In 2016, Scott married Julie and moved into her house. *Id*. at 14:1–5. Scott and Julie believed that they were blending their families. *Id*. at 34:21–22. Jake was therefore always welcome at Julie's house. Prouty Aff. Ex. E, Linnell-Thompson Dep. 8:24–9:1, 10:8–11, ECF No. 26-1. From 2016 to 2018, Jake lived full-time with his mother, except that he spent about one night per month at Julie's house. He also had dinner with Scott and Julie two or three times per month. Thompson Dep. 23:19–24, 36:16–22. Jake did not show up at Julie's house unannounced. He always asked permission to visit, and he would not spend the night if Scott was gone. *Id*. at 8:10–12, 26:13–15; Linnell-Thompson Dep. 9:12–20.

Jake kept no personal belongings at Julie's house, did not have a designated bedroom in the house, did not have a key to the house, did not receive mail at the house, and had no set chores or responsibilities at the house. Thompson Dep. 8:22–25, 24:21–24, 25:4–26:9. Jake was not added to Julie's automobile insurance with Progressive because he was covered under his mother's automobile insurance with American Family. *Id.* at 29:7–30:10.

By 2018—the year of the accident—Jake was 17 years old and a senior in high school. *Id.* at 7:21–25. Following graduation, Jake planned to work in a trade and did not intend to live with Scott and Julie. *Id.* at 31:2–9.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B.  Insurance

"The interpretation of an insurance contract is a question of law." *Jerry's Enters., Inc. v. U.S. Specialty Ins. Co.*, 845 F.3d 883, 887 (8th Cir. 2017) (citation omitted). The parties agree that "[b]ecause this case is in federal court based on diversity jurisdiction, Minnesota's substantive law controls [the Court's] analysis of the insurance policy." *Corn Plus Coop. v. Cont'l Cas. Co.*, 516 F.3d 674, 678 (8th Cir. 2008); *see also* Pl.'s Mem.

Summ. J. 11, ECF No. 25; Def.'s Mem. Summ. J. 6.  Under Minnesota law, courts rely on "general principles of contract law" to interpret insurance policies.  *Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013).  Terms in an insurance policy are interpreted to mean "what a reasonable person in the position of the insured would have understood the words to mean rather than what the insurer intended the language to mean."  *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn. 1977) (citation omitted).  Finally, the "insured party bears the initial burden of demonstrating coverage, and the insurer then bears the burden of establishing an applicable exclusion."  *Rest. Recycling, LLC v. Emp. Mut. Cas. Co.*, 922 F.3d 414, 417 (8th Cir. 2019) (citing *Midwest Fam.*, 831 N.W.2d at 636).

The parties dispute whether Progressive is required to indemnify Jake.  As described above, that question turns on whether Jake was "residing in the same household" as Julie and Scott at the time of the accident.[5]  The Minnesota Supreme Court has repeatedly held that the term "resident" in an insurance contract is not ambiguous.  *See, e.g., Lott v. State Farm Fire & Cas. Co.*, 541 N.W.2d 304, 306–07 (Minn. 1995) (finding "residents of your household" unambiguous); *Tollefson v. Am. Fam. Ins. Co.*, 226 N.W.2d 280, 283 (Minn. 1974) (finding "residents of the same household"

---

[5]Residency is "essentially a fact question," but when the facts are not in dispute (as is true here) a court may determine residency as a matter of law.  *See Fruchtman v. State Farm Mut. Auto. Ins. Co.*, 142 N.W.2d 299, 300 (Minn. 1966); *French v. State Farm Mut. Auto. Ins. Co.*, 372 N.W.2d 839, 841 (Minn. Ct. App. 1985).

unambiguous).[6]  The Court will therefore apply that unambiguous phrase "to the facts of the case in order to give effect to the plain meaning of the language."[7]  *Firemen's Ins. Co. of Newark v. Viktora*, 318 N.W.2d 704, 706 (Minn. 1982).

Minnesota courts are often asked to determine whether a relative was a "resident" of a policyholder's household for the purposes of an insurance policy.  *See, e.g.*, *McGlothlin v. Steinmetz*, 751 N.W.2d 75, 82 (Minn. 2008); *Am. Fam. Mut. Ins. Co. v.*

---

[6]At the hearing, Rithmiller's counsel argued that Minnesota's strong public policy of requiring drivers to purchase insurance to protect victims of car accidents should motivate the Court to find residency in this case.  The Court disagrees for two reasons.  First, Jake's car *was* insured—under the American Family policy.  Schmidt Aff. Ex. B.  Second, Minnesota courts construe the language of an insurance policy against an insurer only when the language is ambiguous.  *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006).  As discussed, the Minnesota Supreme Court has held that the term "resident" is not ambiguous.  *See Lott*, 541 N.W.2d at 307.  A court cannot ignore the plain terms of a contract between an insurer and an insured in order to further a general public policy of compensating victims of car accidents.

[7]In his reply brief, Rithmiller argues for the first time that Progressive included "special" language in its policy by defining "resident" to include a person "in the same family unit, even though temporarily living elsewhere."  Def.'s Reply Mem. Summ. J. 1–2, ECF No. 36.  Rithmiller contends that the Court must use this definition when determining if Jake was a resident of Julie's house.  *Id*.  Rithmiller is mistaken.  The language that Rithmiller quotes comes from the definition of "family member" appearing in the "Additional Definitions" section of Part II of the policy.  Schmidt Aff. Ex. C, at 24.  Those definitions apply only to Part II, and not to any other part.

Part II provides personal injury protection ("PIP") coverage to insureds who are injured in accidents; Part I provides liability coverage to insureds who are required to pay damages to third parties.  Rithmiller's claim against Jake falls within Part I, and thus the "Additional Definitions" that apply to Part II are irrelevant.

*Thiem*, 503 N.W.2d 789, 790–91 (Minn. 1993); *Viktora*, 318 N.W.2d at 706–07.  The

Minnesota Supreme Court has held that, in making that determination, courts should

consider the "*Pamperin* factors":  "(1) Living under the same roof; (2) in a close, intimate

and informal relationship; and (3) where the intended duration is likely to be

substantial . . . ."  *Viktora*, 318 N.W.2d at 706 (quoting *Pamperin v. Milwaukee Mut. Ins.

Co.*, 197 N.W.2d 783, 788 (Wis. 1972)).  The *Pamperin* factors are not exclusive, however,

and Minnesota courts have relied on a wide range of additional considerations.  *See, e.g.,*

*id.* at 706–07 (considering whether the individual was self-supporting, had plans to

leave, received mail, paid rent, and stayed for a long time); *Wood v. Mut. Serv. Cas. Ins.*

*Co.*, 415 N.W.2d 748, 750 (Minn. Ct. App. 1987) (considering age, establishment of

separate residence, self-sufficiency, frequency and duration of stay, intent to return);

*Mut. Serv. Cas. Ins. Co. v. Olson*, 402 N.W.2d 621, 624–25 (Minn. Ct. App. 1987) (noting

that the individual had a designated room, kept personal belongings at the home,

owned a key, did chores, ate meals with residents, and had a close relationship with

residents).

Essentially, though, the *Pamperin* factors and the other factors that have been

considered by Minnesota courts relate to two core issues: connection to people and

connection to place.  The Court will address each issue in turn.

1.  Connection to People

Connection to people is reflected in the second *Pamperin* factor, which requires a

"close, intimate and informal relationship" between the policyholder and the relative.

*Viktora*, 318 N.W.2d at 706 (quotation omitted).  The parties do not dispute that, at the

time of the accident, Jake had a close relationship with Scott and Julie.  Scott had 50-50

joint custody over Jake, which is a relevant—but not controlling[8]—factor.  Thompson

Dep. 8:18–21; *see Am. Fam. Mut. Ins. Co. v. Thiem*, 498 N.W.2d 279, 283 (Minn. Ct. App.

1993) ("The determination of residency should not be based on the status of the parties

under a dissolution judgment, however, but on the facts of the case."), *aff'd in part, rev'd

in part*, 503 N.W.2d 789 (Minn. 1993).  Scott was thoroughly involved in Jake's life.  Scott

communicated with Jake daily, visited Jake at work, engaged in recreational activities

with Jake, provided Jake with financial support, and met with Jake's teachers.

Thompson Dep. 7:15–20, 9:3–10, 12–13, 28:14–19; *see Damsgard v. Liberty Mut. Ins. Co.*,

No. 08-1416 (RHK/AJB), 2009 WL 2424442, at *3 (D. Minn. Aug. 5, 2009) ("In the context

of divorced parents sharing custody of a child, Minnesota courts also consider the

---

[8]Rithmiller argues that the custody order creates a presumption of residency.
Def.'s Mem. Summ. J. 9.  The Court disagrees.  Custody is certainly relevant in
determining the residency of a minor, but Minnesota courts routinely look beyond the
terms of applicable custody orders and carefully analyze a wide range of additional
factors.  *See Jestus v. Jestus*, No. A07-1945, 2008 WL 4471405, at *4–5 (Minn. Ct. App.
Oct. 7, 2008); *Olson*, 402 N.W.2d at 624–25.  Minnesota courts would not do so if a
custody order was determinative.

existence or non-existence of a joint parenting effort, the exercise of parenting time, the

degree of parental involvement, and the intimacy of the relationship between the parent

and child."). Without question, Jake, Scott, and Julie enjoyed an "intimate, informal

family relationship." *Viktora*, 318 N.W.2d at 707.

But that is not the end of the inquiry. A close connection to the policyholder is

necessary to establish residency, but it is not sufficient. Consider, for example, a child

of divorced parents who lives with his mother in South Carolina but who is extremely

close with his policyholder father in Minnesota. Suppose that the father and the son

talk on the phone every day, the father provides all of the son's financial support, the

father often consults with the son's teachers and medical providers, and the father is

involved in every important decision about his son's life. Suppose further that the son

has never traveled to Minnesota and thus has never set foot in his father's house.

Clearly the son could not be considered a "resident" of the father's house, even though

the father and son have a very close relationship.

Hence, this Court's inquiry does not end with determining that Jake, Scott, and

Julie enjoyed a close relationship.[9] "[T]here is a difference between being 'close' and

---

[9]Rithmiller points to Minn. Stat. § 65B.43, subd. 5—a part of Minnesota's No-Fault Act—which provides: "A person resides in the same household with the named insured if that person's home is usually in the same family unit, even though temporarily living elsewhere." Rithmiller argues that, under this definition, a person is deemed to reside in the named insured's household as long as he is a member of the

(continued...)

living together." *Frey v. United Servs. Auto. Ass'n*, 743 N.W.2d 337, 345 (Minn. Ct. App. 2008). Jake was not "residing in the same household" as Julie and Scott unless he was closely connected not only to them, but *to their house*.

2.   Connection to Place

Connection to place corresponds to the first *Pamperin* factor, which examines if the named insured and the relative were "living under the same roof." *Viktora*, 318 N.W.2d at 706 (quotation omitted). Jake, Scott, and Julie were definitely not "living under the same roof" at the time of the accident.[10] *Id.* The Court can identify only three links between Jake and Julie's house: (1) Jake spent one night at the house each month;

<hr/>

(...continued)

same *family* as the named insured, even if the person has never set foot in the named insured's home. *See* Def.'s Mem. Summ. J. 8–12. The Court disagrees. The statute does not provide that a person resides in the named insured's household as long as that *person* is "usually in the same family unit." Rather, the statute provides that a person continues to reside in the named insured's household—"even though temporarily living elsewhere"—as long as "that person's *home* is usually in the same family unit." Minn. Stat. § 65B.43, subd. 5 (emphasis added). Obviously, a person needs to have a connection to a *place* for that place to be the person's "home."

In short, the statute simply provides that, if a person usually lives in the named insured's household, the person will be deemed to continue to live in that household even while temporarily away. Jake has *never* lived in Julie's house, and thus this provision of the No Fault Act has nothing to do with him.

[10]At the hearing, Rithmiller's counsel argued that the Court should consider Jake's connections to the house in which Scott used to live before he married Julie and moved into her house. But Minnesota law is clear that residency is determined as of the time of the incident for which coverage is sought—not as of some earlier time. *State Farm Fire & Cas. Co. v. Short*, 459 N.W.2d 111, 114 (Minn. 1990).

-12-

(2) Jake ate two or three meals at the house each month; and (3) on one or two occasions, Jake invited his friends to swim in the pool at the house (after first getting Julie's permission). Thompson Dep. 23:19–24, 25:13–22, 36:16–22. In light of the meager nature of these contacts, no reasonable person could find that Jake "resided" at Julie's house. Indeed, Minnesota courts have declined to find residency when there was a much more substantial connection between the relative and the policyholder's house. *See, e.g., Auto Owners Ins. Co. v. Hansen*, No. C5-99-685, 1999 WL 787640, at *2 (Minn. Ct. App. Oct. 5, 1999) (finding no residency when grandchild spent two non-consecutive nights per week at grandparent's house).

The inadequate nature of Jake's connection to Julie's house becomes even clearer in light of the other factors that Minnesota courts have used to determine whether a relative resided in a policyholder's house. Jake had no key to Julie's house. Thompson Dep. 26:8–9; *see Olson*, 402 N.W.2d at 624 (child's ownership of key weighed in favor of residency). He did not have a designated room in the house. Thompson Dep. 24:21–24; *see Hansen*, 1999 WL 787640, at *3 (no designated room at the house went against residency). He kept no personal belongings at the house. Thompson Dep. 8:22–25; *see Jestus v. Jestus*, No. A07-1945, 2008 WL 4471405, at *5 (Minn. Ct. App. Oct. 7, 2008) (children brought belongings to father's home each visit, which went against residency). He had no designated responsibilities or chores at the house. Thompson Dep. 25:4–9;

-13-

*see McGlothlin*, 751 N.W.2d at 84 (lack of responsibilities in the home went against

residency).  He did not receive mail at the house.  Thompson Dep. 26:1–2; *see Frey*, 743

N.W.2d at 346 (not receiving mail at the home weighed against residency).  He did not

intend to move into the house after graduating high school or at any other time.

Thompson Dep. 31:2–9; *see Fruchtman v. State Farm Mut. Auto. Ins. Co.*, 142 N.W.2d 299,

301 (Minn. 1966) (intent to move because of Army assignment went against residency);

*French v. State Farm Mut. Auto. Ins. Co.*, 372 N.W.2d 839, 843 (Minn. Ct. App. 1985)

(intent to leave and join the Navy did not support residency).  Finally, when asked who

was residing in her house in February 2018, Julie did not mention Jake.  Linnell-

Thompson Dep. 3:6–12; *see Hansen*, 1999 WL 787640, at *2 (noting that "Spolarich's

grandmother did not believe that Spolarich was a resident of her home[,]" which

weighed against residency but was not determinative by itself).

  The Court can find no case—and the parties have cited no case—in which a court

applying Minnesota law has found a person to be a resident of a policyholder's

household despite so little connection between the person and the household.[11]  The

---

  [11]Rithmiller argues that this case is comparable to cases in which Minnesota courts have found that college students were residents of their family homes despite being away at school.  Def.'s Reply Mem. Summ. J. 2–3.  In those cases, however, the college students had a substantial connection not just to their families, but to their homes.  The students had lived in the homes before leaving for college and the homes remained their permanent residence while they were away.  *See, e.g., Skarsten v. Dairyland Ins. Co.*, 381 N.W.2d 16 (Minn. Ct. App. 1986).  Jake has never lived in Julie's

(continued...)

Court therefore finds as a matter of law that Jake was not a resident of Julie's household.  Because Jake did not reside in Julie's household, he was not an "insured person" under the Progressive policy, and Progressive is not required to indemnify him for any liability incurred in connection with the February 2018 accident.[12]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.     Plaintiff's motion for summary judgment [ECF No. 23] is GRANTED.

2.     Defendant William Rithmiller's motion for summary judgment [ECF No. 28] is DENIED.

3.     The Court DECLARES that on February 22, 2018, defendant Jake Thompson was not an "insured person" under the automobile insurance policy issued by plaintiff Progressive Direct Insurance Company to Julie Linnell-Thompson, and therefore Progressive has no obligation to indemnify Jake Thompson in connection with any claims brought by

---

(...continued)
house.

[12]Because the Court has determined that Jake was not an "insured person" under the Progressive policy, the parties' dispute about the scope of Exclusion 11 is moot.

defendant William Rithmiller arising out of the automobile accident that

occurred on that date.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 8, 2020                    s/Patrick J. Schiltz
                                                        Patrick J. Schiltz
                                                        United States District Judge